# UNITED STATES *v.* CALIFORNIA AND OREGON LAND COMPANY.

APPEAL FROM THE UNITED STATES CIRCUIT COURT OF APPEALS FOR THE NINTH CIRCUIT.

No. 1073. Argued January 10, 11, 1893. — Decided March 6, 1893.

The former decision in this case, 140 U. S. 599, imported that the pleas were sufficient in law, and remanded the case only for an inquiry as to their truthfulness.

A defendant in equity may let the facts averred in the bill go unchallenged, and set up some special matter by plea sufficient to defeat the recovery; and in such case no fact is in issue at the hearing but the matter so specially pleaded.

In these suits those defendants who were not the original wrongdoers had the right to set up any special matter of defence which constituted a defence as to them, and then the inquiry was limited to such matter as between them and the government.

The essential elements which go to make a *bona fide* purchaser f real estate are: (1) a valuable consideration: (2) an absence of no ice of fraud or defect: (3) presence of good faith.

It is again decided that when a statute of the United States delegates to a tribunal or officer full jurisdiction over a subject in which the United States are interested, his or its determination within the limit of his authority is conclusive, in the absence of fraud.

A person holding under a quitclaim deed may be a *bona fide* purchaser. *Oliver* v. *Piatt,* 3 How. 333; *Van Rensselaer* v. *Kearney,* 11 How. 297; *May* v. *Le Claire,* 11 Wall. 217; *Villa* v. *Rodriguez,* 12 Wall. 323; *Dickerson* v. *Colgrove,* 100 U. S. 578; *Baker* v. *Humphrey,* 101 U. S. 494; and *Hanrick* v. *Patrick,* 119 U. S. 156, questioned on this point.

A deed by which the grantor aliens, releases, grants, bargains, sells and conveys the granted estate to the grantee, his heirs and assigns, to have and to hold the same and all the right, title and interest of the grantor therein, is a deed of bargain and sale, and will convey an after acquired title.

On July 2, 1864, Congress passed an act granting lands to the State of Oregon to aid in the construction of a military road from Eugene City to the eastern boundary of the State. 13 Stat. 355, c. 213. A proviso to the first and granting section was: "That the lands hereby granted shall be ex-

clusively applied in the construction of said road, and shall be disposed of only as the work progresses; and the same shall be applied to no other purpose whatever." The third and fourth sections read:

" SEC. 3. *And be it further enacted,* That said road shall be constructed with such width, graduation, and bridges as to permit of its regular use as a wagon road, and in such other special manner as the State of Oregon may prescribe.

" SEC. 4. *And be it further enacted,* That the lands hereby granted to said State shall be disposed of only in the following manner, that is to say : that a quantity of land not exceeding thirty sections for said road may be sold; and when the governor of said State shall certify .to the Secretary of the Interior that any ten continuous miles of said road are completed, then another quantity of land hereby granted, not to exceed thirty sections, may be sold, and so from time to time until said road is completed; and if said road is not completed within five years, no further sales shall be made, and the land remaining unsold shall revert to the United States."

On October 24, 1864, the legislature of Oregon in its turn granted these lands to the Oregon Central Military Road Company, for the purpose of aiding it in constructing the road. Laws of Oregon, 1864, p. 36. On June 18, 1874, Congress enacted:

" CHAP. 305. An act to authorize the issuance of patents for lands granted to the State of Oregon in certain cases.

" Whereas certain lands have heretofore, by acts of Congress, been granted to the State of Oregon to aid in the construction of certain military wagon-roads in said State, and there exists no law providing for the issuing of formal patents for said lands : Therefore,

" *Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That in all cases when the roads in aid of the construction of which said lands were granted are shown by the certificate of the governor of the State of Oregon, as in said acts provided, to have been constructed and completed, patents for said lands shall issue in due form to the State of Oregon as fast as the

same shall, under said grants, be selected and certified, unless the State of Oregon shall by public act have transferred its interests in said lands to any corporation or corporations, in which case the patents shall issue from the General Land Office to such corporation or corporations upon their payment of the necessary expenses thereof: *Provided,* That this shall not be construed to revive any land grant already expired nor to create any new rights of any kind except to provide for issuing patents for lands to which the State is already entitled." 18 Stat. 80.

On March 2, 1889, Congress passed an act, 25 Stat. 850, c. 377, entitled "An act providing in certain cases for the forfeiture of wagon-road grants in the State of Oregon," which commenced with this recital:

"Whereas the United States have heretofore made various grants of public lands to aid in the construction of different wagon-roads in the State of Oregon, and upon the condition that such roads should be completed within prescribed times; and

"Whereas said grants were transferred by said State to sundry corporations, who were authorized by the State to construct such wagon-roads and to receive therefor the grants of lands thus made; and

"Whereas the Department of the Interior certified portions of said lands to the State of Oregon upon the theory that said roads had been completed as required by the granting acts of Congress, and upon the certificate of the governor of the State of Oregon as to such completion; and

"Whereas the legislature of the State of Oregon has memorialized Congress and therein alleged that certain of said wagon-roads, in whole or in part, were not so completed, and that to the extent of the lands coterminous with unconstructed portions the certifications thereof by the Department of the Interior were unauthorized and illegal: Therefore " . . . ; and directed the Attorney General of the United States within six months to institute suits in the Circuit Court of the United States for the District of Oregon against all firms, persons or corporations claiming to own or have an interest in lands

granted to the State of Oregon by certain enumerated acts of
Congress — among others, the act above referred to, of July
2, 1864 — "to determine the questions of the reasonable and
proper completion of said roads in accordance with the terms
of the granting acts, either in whole or in part, the legal effect
of the several certificates of the governors of the State of
Oregon of the completion of said roads, and the right of
resumption of such granted lands by the United States, and to
obtain judgments, which the court is hereby authorized to ren-
der, declaring forfeited to the United States all of such lands
as are coterminous with the part or parts of either of said
wagon-roads which were not constructed in accordance with
the requirements of the granting acts, and setting aside patents
which have issued for any such lands, saving and preserving
the rights of all *bona fide* purchasers of either of said grants,
or of any portion of said grants, for a valuable consideration,
if any such there be. Said suit or suits shall be tried and
adjudicated in like manner and by the same principles and
rules of jurisprudence as other suits in equity are therein tried,
with right to writ of error or appeal by either or any party as
in other cases."

In pursuance of this act, on August 30, 1889, a bill was filed
in the Circuit Court of the United States for the District of
Oregon against the Oregon Central Military Road Company,
the California and Oregon Land Company, and certain named
individuals. The bill, it may be said in a general way, charged
that the road was not in fact constructed; that certificates of
construction were fraudulently obtained from the governors of
the State; that, in pursuance of such false certifications, a
large number of tracts had been certified or patented to the
State of Oregon for the benefit of the Oregon Central Military
Road Company; that thereafter these lands were conveyed
to certain of the individuals named as defendants, and by
them finally to the California and Oregon Land Company;
and, further, that these parties received the deeds with full
knowledge of the fact that the road was not constructed, as
required by the act, and that the certificates were false and
fraudulently obtained. To this bill, on October 24, 1889, the

California and Oregon Land Company filed two pleas and an answer in support thereof. The case was set down for hearing on the pleas, and on February 18, 1890, they were sustained and the bill dismissed. From such decree of dismissal the United States appealed to this court. On May 25, 1891, the decision of the Circuit Court was reversed, (140 U. S. 599,) and the case remanded for further proceedings. The opinion of this court was announced by Mr. Justice Blatchford, and in that opinion will be found a full history of all the matters affecting the litigation up to that time. The conclusion reached was, that the Circuit Court erred in not permitting the United States to reply to the pleas, and in dismissing the bill absolutely. After the mandate had been filed in the Circuit Court, issue was joined on the pleas, testimony taken, and on December 7, 1891, a decree was again entered sustaining the second plea and dismissing the bill of complaint, as to the defendant, the California and Oregon Land Company. From this decree an appeal was taken to the Circuit Court of Appeals, by which court, on March 10, 1892, that decree was affirmed, (7 U. S. App. 128,) and from this decree of affirmance the United States appealed to this court.

*Mr. Assistant Attorney General Parker* for appellants.

The court erred in holding that none of the provisions of the act of Oregon of 1862 applied to the road authorized by Congress. It may be fairly inferred that the act of Congress was left indefinite because of the knowledge possessed that the State prescribed a special manner of construction.

It may also fairly be inferred that the State, in transferring the grant to the wagon-road company without special conditions, relied upon the statute of October 14, 1862, subject to which the company was incorporated, as providing valid and sufficient requirements for the construction of the highways.

Congress, in using the words "may prescribe," cannot be held to have excluded existing laws; it should be held, rather, that the legislation was in view of existing law, and that the real intent was that specifications as to the construction should

be subject to the State, and that the construction should be in accordance with the laws of the State in force at the time the obligation to construct should become binding. Congress did not point to some future enactment, it pointed merely to the law of the State as it should actually exist; and the fact that such law continued, instead of being afterward created, does not exempt the road company from its requirements.

Although the national and state acts, when accepted by the road company, may be held to constitute a contract, this contract must — nothing appearing to the contrary — be held to be made subject to the provisions of existing law.

These land grants were to be exclusively applied to the constructing of the road, and their application to any other purpose was prohibited. The grant was only upon these conditions; the state acts continued, as they must have done, the conditions and limitations, and the act of 1874 has not waived or changed them, and all deeds were subject to these conditions and limitations.

It is submitted that any purchaser receiving such a title of land so granted was bound, at his peril, to know that the conditions had been fulfilled and that the limitations had not been overstepped. He was bound, at his peril, to know whether the constructing company had built the road as required. He was bound to ascertain, at his peril, whether the certificate of the governor was fraudulent or otherwise.

Any person purchasing the land involved was not at liberty to merely look at or have an attorney examine the governor's certificate, but it was his duty to ascertain whether the original acts had been complied with, whether the land had actually been earned, and whether the required road had in fact been built.

It is manifest that the court below coöperated in excluding from the trial the questions which Congress intended should be tried, and the questions which this court may well have anticipated would be tried when the case was sent back for the filing of replies and for a new trial.

The order in which these proceedings of the court appear in the record indicates that the court excluded the evidence

offered first, and then, with a view to protect the defendant, struck out upon their request, that portion of their plea, which alleged that the certificates were honestly made and that they were procured without fraudulent intent or false representation.

It is respectfully submitted to this court that the trial below was so managed as to avoid and evade those tests which Congress and this court expected and intended should be applied in the trial of this case.

*Mr. A. B. Browne* and *Mr. John F. Dillon* for appellee. *Mr. A. T. Britton* was on *Mr. Browne's* brief.

Mr. Justice Brewer, after stating the case, delivered the opinion of the court.

The burden of complaint in this case is, that the Circuit Court erred in restricting the scope of the inquiry. The government sought to introduce testimony to show that the road was never in fact constructed, as required by the act of Congress; and also that the certificates of the governors, made as provided by section 4 of the act of 1864, were obtained by fraud and misrepresentation, as averred, in the bill. But all of this testimony was excluded, and the inquiry limited to the single question whether the Land Company was a *bona fide* purchaser.

The first plea of the Land Company recited the fact that three several certificates had been issued by governors of the State of Oregon, to the effect that the road had been completed as required by the act of Congress, and added, "that each of said several certificates was made honestly and in good faith and without any fraudulent intent or procurement or false representation by any person whomsoever." But upon application to the Circuit Court this clause in the plea was stricken out, leaving it to contain simply an averment of the certificates of the governors; and as these had been set out at length in the bill, there was no issue of fact presented by this plea. The other plea was that the Land Company was a

purchaser in good faith, and to that question, as heretofore stated, the inquiry was restricted.

There was no error in this ruling. The decision of this court, as reported in 140 U. S. 599, was that "the decree of the Circuit Court, so far as it dismisses the bill, must be reversed and the case be remanded to that court with a direction to allow the plaintiffs to reply to and join issue on the pleas," and the mandate which was sent to the Circuit Court recited this direction. That decision was the law of this case for the subsequent proceedings in that court. There was no adjudication that the pleas were insufficient in law; on the contrary, the plain implication of the opinion was that they were sufficient, and the question which was remanded to that court for inquiry was as to their truthfulness. There was no adjudication of insufficiency and no rehearing ordered on that question. If the government was not satisfied with the decision, it should have called our attention to it, and have sought a modification or enlargement of the decree. The Circuit Court properly construed it, and proceeded in obedience thereto to permit the government to join issue on the pleas, and to entertain an inquiry as to their truthfulness, and that was the only matter open for inquiry.

Indeed, that would have been the rule if there had been no decision of this court, and if in the first instance issue had been joined on the pleas. It is true that the statute directed that these suits be brought "to determine the questions of the seasonable and proper completion of said roads," and "the legal effect of the several certificates of the governors;" and upon that counsel for the government insists that its mandate was that there should be full inquiry as to these matters; but that statute also provided "that said suit or suits shall be tried and adjudicated in like manner and by the same principles and rules of jurisprudence as other suits in equity are therein tried;" and the unquestionable right of a defendant in an equity suit is to let the facts averred in the bill go unchallenged, and by plea set up some special matter, which, if established and sufficient, will defeat any recovery. Even if it were within the competency of Congress to compel every

party named as defendant to a suit in equity brought by it, to bear all the expenses and submit to all the delay of a prolonged inquiry into the truth of the facts averred in the bill, it is obvious from the language we have quoted from the statute that Congress did not, intend to deprive any party of the rights ordinarily vested in defendants in suits in equity. If the sole purpose were to ascertain by judicial investigation whether the roads were in fact completed as required, that purpose could have been accomplished by making defendants only the original parties, the wrongdoers. If other parties than they were made defendants, as is the fact here, such parties, within the terms of the statute, had the right by plea to set up any special matter which as to them constituted a full defence; and as between such parties and the government, the inquiry, by settled rules of equity, was then limited to such matter.

In *Farley* v. *Kittson*, 120 U. S. 303, 314, 315, 316, the nature and functions of a plea were fully discussed. It was said : " But the proper office of a plea is not, like an answer, to meet all the allegations of the bill; nor like a demurrer, admitting those allegations, to deny the equity of the bill; but it is to present some distinct fact, which of itself creates a bar to the suit, or to the part to which the plea applies, and thus to avoid the necessity of making the discovery asked for, and the expense of going into the evidence at large. Mitford Pl. (4th ed.) 14, 219, 295 ; Story Eq. Pl. §§ 649, 652.

" The plaintiff may either set down the plea for argument, or file a replication to it. If he sets down the plea for argument, he thereby admits the truth of all the facts stated in the plea, and merely denies their sufficiency in point of law to prevent his recovery. If, on the other hand, he replies to the plea, joining issue upon the facts averred in it, and so puts the defendant to the trouble and expense of proving his plea, he thereby, according to the English chancery practice, admits that, if the particular facts stated in the plea are true, they are sufficient in law to bar his recovery; and if they are proved to be true, the bill must be dismissed, without reference to the equity arising from any other facts stated in the bill. Mitford

Pl. 302, 303; Story Eq. Pl. § 697. That practice in this particular has been twice recognized by this court. *Hughes* v. *Blake*, 6 Wheat. 453, 472; *Rhode Island* v. *Massachusetts*, 14 Pet. 210, 257."

And again: "In a case so heard, decided by this court in 1808, Chief Justice Marshall said: 'In this case the merits of the claim cannot be examined. The only questions before this court are upon the sufficiency of the plea to bar the action, and the sufficiency of the testimony to support the plea as pleaded.' *Stead* v. *Course*, 4 Cranch, 403, 413. In a case before the House of Lords a year afterwards, Lord Redesdale 'observed, that a plea was a special answer to a bill, differing in this from an answer in the common form, as it demanded the judgment of the court, in the first instance, whether the special matter urged by it did not debar the plaintiff from his title to that answer which the bill required. If a plea were allowed, nothing remained in issue between the parties, so far as the plea extended, but the truth of the matter pleaded.' 'Upon a plea allowed, nothing is in issue between the parties but the matter pleaded, and the averments added to support the plea.' 'Upon argument of a plea, every fact stated in the bill, and not denied by answer in support of the plea, must be taken for true.' *Roche* v. *Morgell*, 2 Sch. & Lef. 721, 725–727."

The right, therefore, of this defendant, the California and Oregon Land Company, to avail itself of a plea cannot be doubted; and the plea which it made in this case, that of a *bona fide* purchaser, is one favored in the law. In the act directing these suits was a clause "saving and preserving the rights of all *bona fide* purchasers of either of said grants, or of any portion of said grants, for a valuable consideration, if any such there be." In Story's Equity Jurisprudence, section 411, the author says: "Indeed, purchasers of this sort [*bona fide* purchasers] are so much favored in equity, that it may be stated to be a doctrine now generally established, that a *bona fide* purchaser for a valuable consideration, without notice of any defect in his title at the time of his purchase, may lawfully buy in any statute, mortgage or other encumbrance upon the same estate for his protection. If he can

defend himself by any of them at law, his adversary will have no help in equity to set these encumbrances aside; for equity will not disarm such a purchaser; but will act upon the wise policy of the common law, to protect and quiet lawful possessions, and strengthen such titles." And the reason of this is given in *Boone* v. *Chiles*, 10 Pet. 177, 210, as follows: "This leads to the reason for protecting an innocent purchaser, holding the legal title, against one who has the prior equity; a court of equity can act only on the conscience of a party; if he has done nothing that taints it, no demand can attach upon it, so as to give any jurisdiction. . . . Strong as a plaintiff's equity may be, it can in no case be stronger than that of a purchaser, who has put himself in peril by purchasing a title, and paying a valuable consideration, without notice of any defect in it, or adverse claim to it." See, also, *Lea* v. *Polk County Copper Co.*, 21 How. 493, 497, 498; *Croxall* v. *Shererd*, 5 Wall. 268.

In *United States* v. *Burlington &c. Railroad Co.*, 98 U. S. 334, 342, it was said: "It [the United States] certainly could not insist upon a cancellation of the patents so as to affect innocent purchasers under the patentees." And, again, in *Colorado Coal Company* v. *United States*, 123 U. S. 307, 313: "It is fully established by the evidence that there were in fact no actual settlements and improvements on any of the lands, as falsely set out in the affidavits in support of the preëmption claims and in the certificates issued thereon. This undoubtedly constituted a fraud upon the United States sufficient in equity as against the parties perpetrating it, or those claiming under them with notice of it, to justify the cancellation of the patents issued to them. But it is not such a fraud as prevents the passing of the legal title by the patents. It follows that to a bill in equity to cancel the patents upon these grounds alone the defence of a *bona fide* purchaser for value without notice is perfect."

The Land Company, therefore, had a right to set up a special plea, and the plea which it did set up, that of a *bona fide* purchaser, was sufficient if true. And this brings us to an inquiry as to whether this plea was sustained by the testi-

mony. The purchase was made by a party of gentlemen living in California, in the spring and fall of 1874, the first purchase being of an undivided one-half, and the second of the remaining moiety. Ten persons were named as grantees in the first deed, and eleven in the second, some of whom were also grantees in the first. The title remained thus distributed among these several individuals until 1877, when, for convenience in the care and sale of the property, they all united in a conveyance of their respective interests to the California and Oregon Land Company, of which they were the stockholders. The price for these lands, $200,000, was paid, and paid in cash, the several purchasers each contributing his respective proportion. Since the purchase they have expended in the care of the property, including taxes, $140,000, while their receipts for sales and rentals amount to only about $23,000. More than half of the parties interested in the purchase died before the taking of testimony in this suit. The survivors were all called as witnesses, and each for himself testified, as strongly as language can express it, that his purchase was made in good faith ; that he had no knowledge of any defect in the title, or of anything wrong in the actions of the Military Road Company, or of any failure on its part to fully construct the road. There was no opposing testimony ; and if the question be one simply of fact, there can be no doubt that these parties were *bona fide* purchasers within the rule laid down in 2 Pomeroy Eq. Jur., § 745, to wit: "The essential elements which constitute a *bona fide* purchase are, therefore, three: a valuable consideration, the absence of notice, and presence of good faith." Indeed, counsel for the government does not seriously dispute that this is the necessary conclusion from the testimony. In this connection it is worthy of notice that the purchasers, when their attention was called to the fact that this property was for sale, sent an agent to Oregon to examine into the matter. While such agent is dead, and what he ascertained is, therefore, not affirmatively shown, yet it does appear that, to the survivors, at least, of the purchasers, he brought no intimation or suggestion of any defect in the title of the land. On the contrary, an abstract of title was presented to them,

showing the certificates of the governors of the completion of the work, together with an opinion from the firm of Mitchell & Dolph, two of the leading lawyers in the State of Oregon, that the title of the Road Company was perfect.

Further, the significance of the certificates of the governors, as an independent matter in this inquiry, must not be over-looked. Under the decision in *Land Company* v. *Courtright*, 21 Wall. 310, the title to the first thirty sections did not depend on the completion of the road, and with respect to the residue of the land, the fourth section of the act of 1864 gave to the governor of the State the power to determine when it should be fully earned; for it reads that "when the governor of said State shall certify to the Secretary of the Interior that any continuous ten miles of said road are completed, then another quantity of land hereby granted, not to exceed thirty sections, may be sold, and so from time to time until said road is completed." And because there was no express provision for the issue of former patents, the act of 1874, which took effect intermediate the first and second deeds from the Road Company, provided, that when the roads were "shown by the certificate of the governor of the State of Oregon, as in said acts provided, to have been constructed and completed, patents for said lands shall issue in due form to the State" or its grantee. Now, it is familiar law that when jurisdiction is delegated to any officer or tribunal, his or its determination is conclusive. Thus in the case of *United States* v. *Arredondo*, 6 Pet. 691, 729, this court said: "It is a universal principle, that, where power or jurisdiction is delegated to any public officer or tribunal over a subject-matter, and its exercise is confided to his or their discretion, the acts so done are binding and valid as to the subject-matter; and individual rights will not be disturbed collaterally for anything done in the exercise of that discretion within the authority and power conferred. The only questions which can arise between an individual claiming a right under the acts done, and the public, or any person denying its validity, are, power in the officer, and fraud in the party. All other questions are settled by the decision made or the act done by the tribunal or officer; whether ex-

ecutive, (1 Cranch, 170, 171,) legislative, (4 Wheat. 423; 2 Pet. 412; 4 Pet. 563,) judicial, (11 Mass. 227; 11 S. & R. 429; adopted in 2 Pet. 167, 168,) or special, (20 Johns. 739, 740; 2 Dow P. C. 521, etc.,) unless an appeal is provided for, or other revision, by some appellate or supervisory tribunal, is prescribed by law." See also the following cases: *Foley* v. *Harrison*, 15 How. 433, 448; *Johnson* v. *Towsley*, 13 Wall. 72, 83; *Smelting Company* v. *Kemp*, 104 U. S. 636, 640; *Shepley* v. *Cowan*, 91 U. S. 330, 340; *Moore* v. *Robbins*, 96 U. S, 530, 535; *Quinby* v. *Conlan*, 104 U. S. 420, 426; *Steel* v. *Smelting Co.*, 106 U. S. 447, 450; *Lee* v. *Johnson*, 116 U. S. 48, 51; *Wright* v. *Roseberry*, 121 U. S. 488, 509.

It is true that the bill alleges that these certificates were procured by the Road Company by and through the false and fraudulent representations of its officers, agents, etc., and also true that the averment in the first plea, that the certificates were made honestly and in good faith, was stricken out, and testimony offered to show the way in which the certificates were obtained was rejected. Therefore, as the inquiry is now presented, it must be in the light of the uncontested allegation that the certificates were obtained through the fraudulent acts of the Road Company. It may be that, in view of this situation of affairs, the Road Company could not avail itself of such determinations by the governors as decisive of its title, and it may also be that the purchasers are likewise precluded from claiming that these determinations are in and of themselves conclusive in their favor, but at the same time they are significant with respect to that element of good faith, which consists in diligence. The testimony shows that the purchasers knew of nothing wrong in respect to the title, or the proceedings of the Road Company, or any officials connected with the transfer of title. They knew that determination of the question as to the completion of the road was committed by the statute to the governor of the State. They saw his adjudication upon that question, and it may well be held that they took all the active measures which under the circumstances they could be required to take when they ascertained that the authorized official, and that official the chief executive

of the State, the grantee named in the Congressional act, had officially determined that the road was completed, there being nothing in any of the circumstances surrounding the parties to suggest a suspicion of wrong. Can it be that they must be adjudged derelict in diligence because they did not make a personal examination of the road, and determine for themselves whether it was in its entire length completed so as to satisfy all of the terms of the grant? If a patent from the government be presented, surely a purchaser from the patentee is not derelict, and does not fail in such diligence and care as are required to make him a *bona fide* purchaser, because he relies upon the determination made by the land officers of the government in executing the patent, and does not institute a personal inquiry into all the anterior transactions upon which the patent rested.

As against these evidences and conclusions of good faith but a single proposition is raised, one upon which the dissenting judge in the Circuit Court of Appeals rested his opinion, and that is the proposition that the conveyances from the Road Company were only quitclaim deeds, and that a purchaser, holding under such a deed cannot be a *bona fide* purchaser, and in support of this proposition reference is made to the following cases in this court: *Oliver* v. *Piatt*, 3 How. 333, 410; *Van Rensselaer* v. *Kearney*, 11 How. 297; *May* v. *Le Claire*, 11 Wall. 217, 232; *Villa* v. *Rodriguez*, 12 Wall. 323, 339; *Dickerson* v. *Colgrove*, 100 U. S. 578; *Baker* v. *Humphrey*, 101 U. S. 494; *Hanrick* v. *Patrick*, 119 U. S. 156. The argument, briefly stated, is that he who will give only a quitclaim deed in effect notifies his vendee that there is some defect in his title, and the latter, taking with such notice, takes at his peril. It must be confessed that there are expressions in the opinions in the cases referred to which go to the full length of this proposition. Thus, in *Baker* v. *Humphrey*, 101 U. S. 494, 499, Mr. Justice Swayne, in delivering the opinion of the court, uses this language: "Neither of them was in any sense a *bona fide* purchaser. No one taking a quitclaim deed can stand in that relation." Yet it may be remarked that in none of these cases was it necessary to go to the full extent of

denying absolutely that a party taking a quitclaim deed could be a *bona fide* purchaser; and in the later case of *McDonald* v. *Belding*, 145 U. S. 492, it was held, in a case coming from Arkansas, and in harmony with the rulings of the Supreme Court of that State, that while ordinarily a person holding under a quitclaim deed may be presumed to have had knowledge of imperfections in his vendor's title, yet that the rule was not universal, and that one might become a *bona fide* purchaser for value although holding under a deed of that kind; and in that case the grantee so holding was protected as a *bona fide* purchaser: while in the case of *Moelle* v. *Sherwood*, just decided, *ante*, 21, the general question was examined, and it was held that the receipt of a quitclaim deed does not of itself prevent a party from becoming a *bona fide* holder, and the expressions to the contrary, in previous opinions, were distinctly disaffirmed.

But, further, and even if the doctrine were now recognized to be as heretofore stated, this fact would take the case out from the reach of the rule. The title passed from the Road Company to the purchasers by four conveyances: two from the Road Company to one Pengra, its agent and superintendent; and two from Pengra to the purchasers. Now, the deeds from Pengra are not quitclaims; they do not purport to be merely releases of his right, title and interest; but are strictly deeds of bargain and sale. The granting clause is in these words: " The said parties of the first part have aliened, released, granted, bargained, sold, and by these presents they do alien, release, grant, bargain, sell and convey unto the said parties of the second part, their heirs and assigns, in proportions hereafter specified, the equal undivided one-half ($\frac{1}{2}$) of all and singular the lands lying and being in the State of Oregon, granted or intended to be granted to the State of Oregon by act of Congress," etc. And the *habendum* is: " To have and to hold all and singular the lands and premises hereby conveyed, to wit, said undivided one-half of all the above-described grant of lands listed and to be listed, and all the right, title and interest of the party of the first part therein."

Such a deed is clearly something more than one of quit-

claim and release; it is a deed of bargain and sale, and will convey an after-acquired title. Such is the ruling of the Supreme Court of Oregon. *Taggart* v. *Risley*, 4 Oregon, 235. Now, even in those courts in which the rule was announced, that one who takes under a quitclaim deed cannot be a *bona fide* purchaser, it was sometimes limited to the grantee in such a deed, and not extended to those cases in which a quitclaim was only a prior conveyance in the chain of title. *Snowden* v. *Tyler*, 21 Nebraska, 199. And this is certainly a most reasonable limitation, because the rule is obviously, at the best, arbitrary and technical; for a party who receives a quitclaim deed may act in the utmost good faith, and in fact be ignorant of any defect in the title, and this, although he has made the most complete and painstaking investigation, and only takes the quitclaim deed because the grantor, for expressed and satisfactory reasons, declines to give a warranty. It would be unfortunate, in view of the fact that in so many chains of title there are found quitclaim deeds, to extend a purely arbitrary rule so as to make the fact of such a deed notice of any prior defect in the title.

It may be said that the real transaction was between the Road Company and the purchasers; that the agent and superintendent of the Road Company was merely a go-between, a conduit through which the title passed from the Road Company to the purchasers; and that the spirit, if not the letter of the rule, requires that the form of conveyance used by the Road Company should be controlling as to the *bona fides* of the purchasers. But as it is, wherever enforced, a merely technical and arbitrary rule, justice requires that it should not be carried beyond its express terms, nor used to disprove the good faith which, in this case, all the other testimony shows in fact existed in the purchasers. And in this respect it is well to consider the obvious reason for the unwillingness of the Road Company to itself execute a warranty deed. The original act of 1864 said nothing about patents; it simply granted the lands to the State, and authorized their sale; and only after the arrangement had been made for the purchase of one-half of these lands, and the

conveyances made. therefor, was the act of 1874 passed, providing in terms for patents. The claim of the Road Company was, that their title was a perfect legal title, even without a patent; and yet there being a doubt in respect thereto — a doubt which was solved only by the act of 1874 — it was not strange that it preferred. to quitclaim its interest in the granted lands rather than to formally convey them by a warranty of the legal title. But it is not to be inferred therefrom, as a matter of law, that the Road Company in any way doubted its full equitable title, or that, by the fact of a quitclaim, it notified the purchasers of any other matter than this omission in the statute. On the contrary, the plain import of the language used in the conveyance from the Road Company to Pendra was that it intended to convey the lands which it had received under the grant, and to which it believed it then had a full equitable, if not legal, title. Our conclusions, therefore, are that the decision of the Circuit Court and the Court of Appeals was correct.

Before closing this opinion, we think it proper to notice one matter which, though of no significance in determining the legal rights of the parties, may throw light upon the transaction, and perhaps relieve the original donee of the grant by the State, the Road Company, from the imputation of wrong cast upon it by the filing of this bill. The grant was made in 1864, and the last certificate of the governor of Oregon was dated the 12th of January, 1870. The memorial of the legislature of the State of Oregon was adopted in 1885, that memorial which induced the act of Congress and this litigation. In other words, the State of Oregon and its citizens, including those living along this road, remained silent for fifteen years after its alleged completion. The terms of the original grant were limited to the construction of the road, and imposed no duty of thereafter keeping it in good condition. Having earned the grant by constructing the road, it may well be that the Road Company took no further interest in it, and an ordinary wagon-road, uncared for during fifteen years, particularly that part of it which runs through mountainous country, would be almost completely destroyed by the

action of the elements; and so it may be that those, who in 1884 and 1885 investigated the matter, found little semblance of a road, and hence concluded, though erroneously, that none was ever constructed, and from this the complaint, the memorial, and the litigation proceeded; and this is consistent with the fact that the Road Company fully discharged its duty and fairly earned the lands. Of course, this is a mere suggestion; but it has the probabilities in its favor, and relieves all parties from condemnation. But whether this be true or not, for the reasons we have heretofore stated, our conclusion is clear that the title of the purchasers and the Land Company is beyond challenge.

*The decree is affirmed.*