JOHN J. BABCOCK *vs.* WILLIAM R. WELLS *et al.*

WASHINGTON—FEBRUARY 6, 1903.

PRESENT: Stiness, C. J., Tillinghast and Rogers, JJ.

(1) *Quitclaim Deeds. Equities. Purchasers for Value. Notice.*

No implication of a defect in title can be drawn from the use of a quitclaim deed, so as to make the grantees in the chain of title thereunder purchasers with notice.

(2) *Mortgages. Notice. Equities. Purchasers for Value.*

Notice to one mortgagee of the equitable interest of a third party in the mortgaged property will not operate as notice to the co-mortgagee.

BILL IN EQUITY. The facts are stated fully in the opinion. Heard on bill, answers, and proofs.

STINESS, C. J.   It appears from the pleadings that Jacob D. Babcock, deceased, left three children, John J. Babcock, Harriet E. B. Cundall, and Sarah A. Humphrey, who became tenants in common of the property involved in this suit, and so occupied it up to January 30, 1877.

At that date a suit for partition, brought by Mrs. Humphrey, was pending.

It is claimed that she was indebted to her brother and sister for repairs and other expenses, on account of which she agreed to transfer her third to them for the sum of twenty-five hundred dollars, said suit to be discontinued without costs; that Babcock applied to Thomas R. Wells for said sum, who agreed to furnish it upon a mortgage of the Humphrey share, as security; that Wells went to Providence to meet Mrs. Humphrey, to arrange the matter, on January 30, 1877, and took a quitclaim deed from her to himself, representing that he took it as security for the twenty-five hundred dollars paid to her, according to his arrangement with Babcock, because it was more convenient than to get a mortgage.   The suit for partition was thereupon discontinued.

This bill was filed December 9, 1881, and on December 10, 1881, a restraining order against alienating or encumbering the property was entered, which is still in force.   In 1898, upon conveyance by Mrs. Cundall to John J. Babcock of all her interest in the property, a decree was entered to amend the bill by making said Babcock sole complainant.

This bill is brought to redeem the one-third share transferred from Mrs. Humphrey to Thomas R. Wells by the deed of January 30, 1877, upon the ground that it operated only as a mortgage, by reason of the trust under which said Wells took the title.

The title is too voluminous to refer to in detail, and, the question being one of fact, it is sufficient to say that, both from preponderance of testimony and corroboration in conduct of the parties, we find that the deed from Mrs. Humphrey to Thomas R. Wells was taken as security, in lieu of a mortgage, for the sum of twenty-five hundred dollars, as alleged in the bill.

This being so, Thomas R. Wells held the one-third interest as trustee for Babcock and Mrs. Cundall, to be conveyed to them upon payment of the debt thereby secured. *Jenckes* v. *Cook*, 9 R. I. 520; *Aborn* v. *Padelford*, 17 R. I. 143; *Whiting* v. *Dyer*, 21 R. I. 86.

The complainant testifies that the arrangement was recognized as a loan of twenty-five hundred dollars, on which interest was to be paid at the rate of seven per cent.

After the deed from Mrs. Humphrey to Thomas R. Wells, January 30, 1877, Babcock and his sister remained in possession of the property, as owners, and collected all that was paid for rents thereof, a portion of which was leased and occupied by firms of which Thomas R. Wells was a member, Wells neither demanding nor collecting rent for the one-third share which he held by said deed.

August 1, 1877, Thomas R. Wells gave a quitclaim deed of the property conveyed to him by Mrs. Humphrey to Sylvia E. Salisbury and William R. Wells, to whom he was indebted, reciting a consideration of $2,500; although no money was in fact paid, the deed being taken on account of the indebtedness. At the same time they gave a bond to said Thomas R. Wells to sell the property described in said deed back to him, on or before April 1, 1878, for the sum of $2,500, Thomas R. Wells to occupy said property in the meantime, and to pay as rental therefor at the rate of seven per cent. per annum on said sum. Thomas R. Wells did not occupy the property described in the deed, however, except as a member of firms paying rent.

The firms occupying the property, in which said Wells was a partner, failed and made assignments January 12, 1878, and the assignee paid rent up to about April 1, 1878, to Babcock, after which time the premises were unoccupied. William R. Wells claims to have taken possession April 1, 1878, that being the time named in his bond for a reconveyance. As to William R. Wells and Sylvia E. Salisbury, the grantees under the quitclaim deed from Thomas R. Wells, the question of fact arises whether they took the conveyance with notice of the equitable title of Babcock, on the ground that the deed was taken and held simply as security.

Upon this point Babcock testifies positively to admissions made by William R. Wells of his knowledge of the transaction. Mrs. Cundall testifies less positively to the language, but to a general admission of their right to redeem. William R. Wells denies any such admissions, but says that, preferring the money to the property, he made a voluntary offer to allow them to redeem for the sum of $2,500 and interest. Looking further to the conduct of the parties, it is quite significant, and, we think, corroborative of the complainant's testimony, that the bond was for the reconveyance, upon payment of the same sum, at the same rate of interest for which it is claimed to be held as security, as though William R. Wells had knowledge of such fact. It would be a remarkable coincidence if, taking the deed to settle up their own estate, they made it subject to exactly the same terms as to Thomas R. Wells that existed between said Wells and Babcock. It is also remarkable, if William was endeavoring to make a settlement and an end of the matter, he should have made the same offer to Babcock after he, William, supposed he had got an absolute title. His conduct is more compatible with the complainant's claim than with his own. Moreover, if he and his sister had an absolute title as against Babcock, they would have been entitled to a share of the rents; but they did not claim it. Still further, the assignee sold the assets of Thomas R. Wells on March 29, 1878, among which was this bond, with only two more days to run according to its terms. William R. Wells bought the bond at the auction, and then claimed that he owned the equity of redemption under the deed from Thomas R. Wells. He therefore very clearly recognized his deed as an equitable mortgage as to Thomas, and although the evidence is not so clear that he and his sister knew of the relation of Thomas to the complainant as it is that Thomas knew it, still we think it fairly shows that they knew of the complainant's equitable claim.

Taking the deed with notice, the property was subject to redemption in the hands of William R. Wells and Mrs. Salisbury.

November 8, 1875, J. J. Babcock and Mr. and Mrs. Cundall

executed a mortgage to Thomas R. Wells on their two-thirds interest in a part of the property in question, to secure a note for $5,000 dated October 25, 1875; a second mortgage dated October 24, 1876, on the same interest in other parts of the property, to secure the same note; and on the same day they executed a similar mortgage on their two-thirds interest in the mill machinery, to further secure the same note.

These mortgages were assigned by Thomas R. Wells to Sylvia E. Salisbury and William R. Wells August 1, 1877, who claim to have foreclosed the personal property mortgage by taking possession April 1, 1878.

Under the powers of attorney in the other two mortgages they advertised the real estate for sale, and sold it, on August 1, 1878, to themselves as purchasers.

Passing by the alleged defects and irregularities of the sale and assuming it to be valid, Sylvia E. Salisbury and William R. Wells were then the apparent holders of the record title, with notice of the complainant's claim of equitable title to one-third of the property under the deed of Sarah A. Humphrey.

On December 18, 1878, Sylvia E. Salisbury and William R. Wells gave two mortgages on the land in question: one to Oliver Langworthy and John D. Kenyon, to secure their indorsements of notes of the mortgagors to an amount not exceeding $2,500; and another in similar terms, on the same with other land, to Oliver Langworthy, subject to the mortgage to said Langworthy and Kenyon.

(1)     The title to the property stood in this way at the time of the filing of the bill, December 9, 1881. After the filing of the bill, the rule of *lis pendens* applied.

The complainant claims that, as the deed from Thomas R. Wells to Wm. R. Wells and Mrs. Salisbury was a quitclaim deed, the grantees cannot be held to be purchasers without notice; that a quitclaim deed, being a mere release, carries upon its face notice of a doubtful title.

There are cases which have supported such a claim, but we do not see that they rest upon a sound principle. A transfer of one's right, title, and interest in land no more implies a defect of title than a deed of bargain and sale which is

supported by a covenant of warranty. There is no question that a quitclaim deed will carry all the interest that the grantor has. A warranty deed, so far as the grant is concerned, can do no more. The stronger inference, if notice is to depend upon that, would seem to be more favorable to the purchaser's belief of a good title in the case of a quitclaim deed than in the case of a warranty deed; for in the former case he is willing to take the grantor's interest as it stands, thereby implying satisfaction with it, while in the latter case the purchaser requires a warranty, implying a need of security to fall back upon, as though he had some doubt of the sufficiency of the title. It cannot be said that there is an implication of defect under a quitclaim and not under a warranty deed. A warranty does not enlarge a grant; it is a covenant of indemnity for a disturbance of it. How can a court say, as a matter either of law or fact, that a quitclaim implies that the grantor has reason to believe his title is defective, because he does not warrant it, when an equally reasonable inference may be that he wants the purchaser to satisfy himself as to the title from the records or otherwise, and that he is unwilling to burden his estate by covenants, running into the future, against defects of which he has no more knowledge than the purchaser. A very large proportion of conveyances of real estate are by quitclaim deed. Under the statute in force when this deed was given, one form was as effectual for delivery of seizin as another. Gen. Stat. cap. 162, § 2. This is more largely stated in Gen. Laws cap. 202, § 11—that any form of conveyance, duly executed, shall be operative to convey to the grantee "all the possession, estate, title, and interest, claim, demand, or right of entry or action of the grantor, absolutely, in and to the land conveyed, unless otherwise expressly limited," and that if duly recorded it shall be operative as against third parties. Doubtless it is true that quitclaim deeds are often obtained for speculative purposes, but the test of their effect is the fact of a purchase in good faith without notice of a defect in title.

As Mr. Justice Field said, in *Moelle* v. *Sherwood*, 148 U. S. 21: "The character of a *bona fide* purchaser must depend upon attending circumstances or proof as to the transaction,

and does not arise as often, though we think inadvertently said, either from the form of the conveyance or the presence or the absence of any accompanying warranty."

In *Flagg* v. *Mann*, 2 Sumner, 486, Judge Story held that a quitclaim deed, where the circumstances showed that it was not intended to operate merely by way of passing a right or by way of extinguishment, was to be treated as a bargain and sale, or other lawful conveyance, saying: "It ordinarily affords very conclusive proof that the purchase is of the whole estate, and not of the mere right or title of the party, whatever it may be."

See also *United States* v. *California Land Co.*, 148 U. S. 31; *Stark* v. *Boynton*, 167 Mass. 443; *Smith* v. *McClain*, 146 Ind. 77; *Bennett* v. *Davis*, 90 Me. 457; *Schott* v. *Dosh*, 49 Neb. 187; *White* v. *McGarry*, 47 Fed. Rep. 420.

We think the better authority is with these cases, which fully sustain the views we have expressed.

If then, as we hold, the mortgagees are not chargeable with notice of the plaintiff's equitable estate by reason of the conveyance to the mortgagor by a quitclaim deed, it follows that they may be regarded as purchasers for value, unless actual notice to them is shown. The testimony shows that Oliver Langworthy had notice, on February 11, 1878, of Babcock's claim that the one-third of the estate was taken by Thomas R. Wells simply as security for the money paid to purchase Sarah A. Humphrey's share, and that this notice was given ten months before the mortgage to said Langworthy and Kenyon.

(2) As to Kenyon, we are referred to no actual notice to him, prior to the taking of the mortgage.

The question therefore arises, Did notice to his co-mortgagee operate as notice to him?

In *Snyder* v. *Sponable*, 1 Hill (N. Y.), 567, it was held that notice to a husband at the time of receiving a conveyance to himself and wife, was not notice to the wife of a prior unrecorded mortgage, so as to give the mortgage a preference in respect to her title, unless the consideration was paid by the husband, thus showing that she was not a purchaser for value. This decision was affirmed in 7 Hill, 427.

In *Wait* v. *Smith,* 92 Ill. 385, it was held that joint purchasers who had notice of an incumbrance would hold their title subject to it, while those who had no notice would not. In *Burt* v. *Batavia,* 86 Ill. 66, it was held that notice of an incumbrance, on property purchased by a corporation, to one of several incorporators would not charge his associates, when he did not act as their agent in forming the company.

To the same effect is *Rippetoe* v. *Dwyer,* 65 Tex. 703; *Wiswall* v. *McGown,* 2 Barb. (N. Y.) 270. See also *Arnold* v. *Greene,* 15 R. I. 348; *Holland* v. *Citizens Bank,* 17 R. I. 87.

We think that the rule thus indicated is founded in reason and equity, and that it applies in this case. The mortgage, however, was simply one of indemnity to the mortgagees, Langworthy and Kenyon, for indorsement of the notes of the mortgagors, William R. Wells and Sylvia E. Salisbury. We are unable to find from the testimony whether Kenyon ever became entitled to indemnity under the mortgage, so as to give him a right to claim under it, and we leave the case open for evidence upon that point.

We decide that at the time of filing this bill the complainants had an equitable interest in one-third of the estate conveyed by the deed of Sarah A. Humphrey, subject to the payment of the consideration therefor, and subject also to the question above stated in regard to the mortgage to Kenyon and Langworthy.

*A. B. Crafts,* for complainant.

*Dexter B. Potter,* for respondents.