UNITED STATES v. SOUTHERN PAC. R. CO. et al.

SOUTHERN PAC. R. CO. et al. v. UNITED STATES.

(Circuit Court of Appeals, Ninth Circuit. October 2, 1899.)

Nos. 494, 495.

1. PUBLIC LANDS—GRANTS TO SOUTHERN PACIFIC RAILROAD.

The decisions of the supreme court in the various suits between the United States and the Southern Pacific Railroad Company involving the right of the latter to lands in California within the limits reserved under the grant to the Atlantic & Pacific Railroad Company must be regarded as having settled that the grant to the Atlantic & Pacific Company became effective, as to the lands between the Colorado river and San Buenaventura, on the coast, on the filing and acceptance by the land department in 1872 of the map of its route between such points, by relation as of the date of the grant, July 27, 1866, and that all the lands within both the primary and indemnity limits of such grant were forfeited by the act of July 6, 1886, and restored to the public domain; and hence as having conclusively determined, as between the parties and their privies, that the Southern Pacific Company did not acquire any of such lands under either its main-line or branch-line grants.

2. SAME—RECOVERY OF LANDS ERRONEOUSLY PATENTED—ACT FOR PROTECTION OF BONA FIDE PURCHASERS.

Under Act March 2, 1896, supplementing Act March 3, 1887, directing the bringing of suits for the recovery of lands erroneously certified or patented under railroad grants, by providing that no patent to any lands held by a bona fide purchaser should be annulled, and confirming the title of such purchasers, all purchasers in good faith, and in the belief that they will obtain a good title from a railroad company of lands which have been patented to it, are protected, whether such patents were issued before or after the commencement of suit.

## Appeal from the Circuit Court of the United States for the Southern District of California.

This is a suit in equity brought by the United States against the Southern Pacific Railroad Company and the other defendants named in the bill, to quiet the title to certain lands in California embraced within the granted and indemnity limits of the Atlantic & Pacific Railroad Company under the act of congress approved July 27, 1866 (14 Stat. 292). The lands in controversy are situated on both sides of that part of the line of the road as located between the Needles, on the Colorado river, and San Buenaventura, on the Pacific Coast.

The act of July 27, 1866, granted lands to aid in the construction of a railroad and telegraph line from the states of Missouri and Arkansas to the Pacific Coast; and, to carry out the purposes of the grant, the act incorporated the Atlantic & Pacific Railroad Company, and authorized that company to lay out, locate, and construct a continuous line of railroad and telegraph from the town of Springfield, in the state of Missouri; thence westerly to the head waters of the Colorado Chiquito; and "thence along the 35th parallel of latitude as near as may be found most suitable for a railway route to the Colorado river, at such point as may be selected by said company for crossing; thence by the most practicable and eligible route to the Pacific." For the purpose of aiding in the construction of this road and telegraph line to the Pacific Coast, the third section of the act granted to the Atlantic & Pacific Railroad Company every alternate section of public land, not mineral, designated by odd numbers, to the amount of 10 alternate sections per mile on each side of said road, whenever it passed through any state, and whenever on the line thereof the United States had full title, not reserved, sold, granted, or otherwise appropriated, and free from pre-emption or other claims or rights at the time the line of said road should be designated by a plat thereof filed in the office of the commissioner of the general land office. It was further provided that

whenever, prior to said time, any of said sections or parts of sections shall have been granted, sold, reserved, occupied by homestead settlers, or pre-empted or otherwise disposed of, other lands shall be selected by said company in lieu thereof, under the direction of the secretary of the interior, in alternate sections, and designated by odd numbers, not more than 10 miles beyond the limits of said alternate sections, and not including the reserved numbers. The sixth section of the act provided "that the president of the United States shall cause the lands to be surveyed for forty miles in width on both sides of the entire line of said road after the general route shall be fixed, and as fast as may be required by the construction of said railroad; and the odd sections of land hereby granted shall not be liable to sale or entry, or pre-emption, before or after they are surveyed, except by said company, as provided in this act." The eighth section of the act provided "that each and every grant, right, and privilege herein are so made and given to and accepted by said Atlantic & Pacific Railroad Company upon and subject to the following conditions, namely: that the said company shall commence the work on said road within two years from the approval of this act by the president, and shall complete not less than fifty miles per year after the second year, and shall construct, equip, furnish, and complete the main line of the whole road by the fourth day of July, Anno Domini eighteen hundred seventy-eight." The eighteenth section of the act provided "that the Southern Pacific Railroad, a company incorporated under the laws of the state of California, is hereby authorized to connect with the said Atlantic & Pacific Railroad, formed under this act, at such point near the boundary line of the state of California as they shall deem most suitable for a railroad line to San Francisco; and shall have a uniform gauge and rate of freight or fare with said road, and in consideration thereof, to aid in its construction, shall have similar grants of land, subject to all the conditions and limitations herein provided; and shall be required to construct its road on the like regulations, as to time and manner, with the Atlantic & Pacific Railroad herein provided for." In 1872 the Atlantic & Pacific Railroad Company filed in the office of the commissioner of the general land office certain maps, designating its line of railroad, as located, from a point selected by the company for crossing the Colorado river by the route deemed by the company the most practicable and eligible to the Pacific. The line of road so designated ran from a point on the Colorado river near the thirty-fifth parallel (the Needles) to San Buenaventura, on the Pacific Coast; thence to Santa Barbara, San Miguel Mission, and San Francisco.

The Southern Pacific Railroad Company, referred to in the eighteenth section of the act of July 27, 1866, was incorporated under the laws of the state of California on the 29th day of November, 1865. The charter of the corporation provided for the building of "a railroad from some point on the Bay of San Francisco in the state of California, and to pass through the counties of Santa Clara, Monterey, San Luis Obispo, Tulare, Los Angeles, and San Diego, to the town of San Diego in said state, thence eastward through the said county of San Diego to the eastern line of the state of California, there to connect with a contemplated railroad from said eastern line of the state of California to the Mississippi river." Under this charter the Southern Pacific Company on the 3d day of January, 1867, filed in the interior department at Washington a plat of preliminary survey showing a line of projected railroad from San Francisco to the Colorado river, with the request that the lands indicated be withdrawn from market. Thereafter, on March 19, 1867, the secretary of the interior directed the commissioner of the general land office to issue instructions to the local land offices in California to withhold the odd-numbered sections within the granted limits of 20 miles on each side of the road, as shown on the map, and also withdraw the odd-numbered sections outside of the 20 miles and within 30 miles on each side of the road, from which the indemnity for lands disposed of within the granted limits were to be taken. These instructions were carried out by the commissioner of the general land office under date of March 22, 1867. The right of the Southern Pacific Railroad Company to have this withdrawal made for its benefit was, however, further considered by the secretary of the interior; and on July 14, 1868, he addressed a communication to the commissioner of the general land office in which he revoked the order of withdrawal contained in his letter of

March 19, 1867, having determined that the map filed by the Southern Pacific Railroad Company was upon a route not authorized by the charter of the company, the laws of California, or contemplated by the act of congress. This revocation was afterwards in part suspended, but finally adhered to by the secretary of the interior in a letter addressed to the commissioner of the general land office under date of November 2, 1869. Thereupon the Southern Pacific Company procured the passage of an act of the legislature of California, approved April 4, 1870 (St. Cal. 1869–70, p. 883), authorizing the company to change the line of its railroad so as to reach the eastern boundary line of the state of California by such route as the company should determine to be the most practicable, and to file new and amendatory articles of association. The act further authorized the company to accept such grants as had been, or might thereafter be, made by congress. On June 28, 1870, congress passed a joint resolution (16 Stat. 382) by which the Southern Pacific Company was authorized to construct its road as near as might be on the route indicated by the map filed by said company in the department of the interior on the 3d day of January, 1867. It was further provided that, as each section of the road should be constructed. patents to lands should issue to the extent and amount granted to said company by said act of July 27, 1866, expressly saving and reserving all the rights of actual settlers, together with the other conditions and restrictions provided for in the third section of said act. Pursuant to this resolution, the order of withdrawal of lands within the granted limits, as made by the secretary of the interior on March 19, 1867 (the revocation of which had been suspended pending action on the part of congress), was renewed and carried into effect by the commissioner of the general land office under date of July 29, 1870. Under the authority of the joint resolution of congress of June 28, 1870, the Southern Pacific Company constructed that part of the railroad from Mojave to the Needles, on the Colorado river, in the year 1885, and at that time filed in the interior department, in sections, its map showing the line of route as so constructed and located by the company; and the land grant to the company was adjusted upon those maps of constructed road. This road from Mojave to the Needles is known as the "Southern Pacific Main-Line Grant." The grant to the Southern Pacific Railroad Company by the joint resolution of June 28, 1870, overlapped the lands withdrawn under the grant to the Atlantic & Pacific made by the act of July 27, 1866, from a point near Mojave to the Colorado river; and those lands are a part of the lands in suit here.

On March 3, 1871, congress passed an act entitled "An act to incorporate the Texas Pacific Railroad Company, and to aid in the construction of its road, and for other purposes" (16 Stat. 573). The twenty-third section of this act provided "that for the purpose of connecting the Texas Pacific Railroad with the city of San Francisco, the Southern Pacific Railroad Company of California is hereby authorized (subject to the laws of California) to construct a line of railroad from a point at or near Tehachapi Pass, by way of Los Angeles, to the Texas Pacific Railroad at or near the Colorado river, with the same rights, grants and privileges, and subject to the same limitations, restrictions, and conditions as were granted to said Southern Pacific Railroad Company of California by the act of July twenty-seven, eighteen hundred and sixty-six: provided, however, that this section shall in no way affect or impair the rights, present or prospective, of the Atlantic & Pacific Railroad Company or any other railroad company." The Southern Pacific Company filed its map of general route under this act of March 3, 1871, from Mojave via Los Angeles to Yuma, on April 3, 1871, and thereafter as the road was constructed, filed its map of road. so constructed and located, in five sections, during the years from 1874 to 1878, inclusive. This grant to the Southern Pacific Company from Mojave via Los Angeles to Yuma is known as the "Branch-Line Grant," and overlaps the lands withdrawn under the grant to the Atlantic & Pacific; and those lands are a part of the lands in controversy here.

The Atlantic & Pacific Railroad Company failed to complete its road as required by the act of July 27, 1866, and in the year 1886 had failed to construct any railroad on its line west of the Colorado river. Thereupon congress passed the act of July 6, 1886 (24 Stat. 123), forfeiting the lands granted to the Atlantic & Pacific Railroad Company adjacent to and coterminous with

the uncompleted portions of the main line of said road embraced within both the granted and the indemnity limits, as contemplated to be constructed under and by the provisions of said act of July 27, 1866, and acts and joint resolutions subsequent thereto, and relating to the construction of said road and telegraph line; and the lands were declared forfeited and restored to the public domain.

The act of March 3, 1887 (24 Stat. 556), entitled "An act to provide for the adjustment of land grants made by congress to aid in the construction of railroads, and for the forfeiture of unearned lands, and for other purposes," provided for the immediate adjustment of all railroad land grants made by congress; and upon the completion of such adjustment, if it should appear that lands had been, from any cause, erroneously certified or patented by the United States to or for the use or benefit of any company claiming by, through, or under grant from the United States to aid in the construction of a railroad, it was made the duty of the secretary of the interior to demand from such company a relinquishment or reconveyance to the United States of all such lands, whether within granted or indemnity limits; and, if such company should neglect or fail to so reconvey such lands to the United States within 90 days after such demand, it should thereupon be the duty of the attorney general to commence and prosecute in the proper courts the necessary proceedings to cancel all patents, certificates, or other evidence of title theretofore issued for such lands, and to restore the title thereof to the United States. The act of congress approved March 2, 1896 (29 Stat. 42), provided for the extension of the time within which suits might be brought to vacate and annul land patents, and provided that no patent to any lands held by a bona fide purchaser should be vacated or annulled, but the right and title of such purchaser was by the act confirmed.

The present action was commenced in the Southern district of California on the 14th day of May, 1894. The bill of complaint alleged, among other things, that the plaintiffs are the absolute owners, by title in fee simple, and are in the possession, of the lands described in an exhibit marked "A," attached to the bill of complaint; that the officers of the interior department have erroneously, and without any authority of law, caused to be issued to the defendant the Southern Pacific Railroad Company patents of the United States, in due form of law, for the tracts of land described in Exhibit A. The prayer of the bill is that the title of the plaintiffs to the lands described in Exhibit A be quieted; that the patents be vacated and decreed to be void, and that the defendants, and each of them, be forever enjoined from asserting or claiming any right or title to said lands adverse to the plaintiffs; and that the defendants be forever enjoined from chopping down or carrying away any wood, trees, or timber upon said lands, and from removing any minerals or other valuable deposits thereon. The bill also includes the unpatented lands within the granted and indemnity limits of the Atlantic & Pacific Railroad Company in California, and alleges that maps of definite location, designating that part of the line, were filed by the company in the general land office in the year 1872: that, as said plats or maps were filed in the interior department, they were each then approved by the secretary of the interior, and upon the filing of such maps or plats the United States withdrew from market and reserved all the odd-numbered sections of land in California within 30 miles of said line of route, and, in pursuance of orders of the secretary of the interior and commissioner of the general land office, the withdrawal and reservation of said lands were then made of record in the general land office and United States district land offices; that the Atlantic & Pacific Railroad Company did not, within the time or manner required by the act of July 27, 1866, or at all, construct or complete any railroad or telegraph line in whole or in part within the state of California, and by the act of congress approved July 6, 1886 (24 Stat. 123), all lands and rights to lands granted to and conferred upon said Atlantic & Pacific Railroad Company, and situated within the state of California, were forfeited and returned to the United States, and said lands were restored to the public domain, including all the odd-numbered sections of land for 30 miles on each side of the line of route of said Atlantic & Pacific Railroad Company between the eastern boundary of California and the Pacific Ocean at San Buenaventura. The bill alleges that the defendant the

Southern Pacific Railroad Company claims that a line of railroad and telegraph from Tehachapi Pass, by way of Los Angeles, to the Colorado river, had been constructed by the defendant within the time and in the manner provided by the act of congress approved March 3, 1871 (16 Stat. 573); that the company accepted said grant, and in the year 1874 designated its line by a plat thereof filed in the office of the commissioner of the general land office, and the defendants claim that the lands described in the act were granted to said company by said act, but it is alleged that none of said lands were granted to the Southern Pacific Railroad Company or to any of the other defendants by said act of congress; that, on the contrary, they were lands reserved and otherwise claimed, and are still owned by the United States. It is further alleged that the defendants, and each of them, claim some interest in said lands under and by virtue of said act of March 3, 1871, and not otherwise. With respect to these lands claimed by the defendants, and for which patents had not been issued, the prayer of the bill is that the court will define and determine the rights of the plaintiffs to the odd-numbered sections of land in California within the 30-mile limits of the line of route of the Atlantic & Pacific Railroad Company, as shown by the maps of said company on file and of record in the general land office, and will decree that the United States are the owners in fee of said lands, as against all rights and claims of the defendants based upon or through said grants made by the United States by said acts of congress approved July 27, 1866, and March 3, 1871, except the lands embraced in pending suits against the defendants. The plaintiffs on May 21, 1894, filed an amendment to their bill, praying that their rights and title to the lands within the granted and indemnity limits of the Atlantic & Pacific Railroad Company be quieted, and the defendants perpetually enjoined from having or claiming any right, title, or interest in or to said lands, from, through, or under the acts of congress approved July 27, 1866 (14 Stat. 292), or March 3, 1871 (16 Stat. 573), or joint resolution of congress approved June 28, 1870 (Id. 382), for which it is alleged patents have been erroneously issued to the Southern Pacific Railroad Company.

The lands described in Exhibit A amount to 29,914.24 acres. The United States attorney on January 7, 1898, dismissed the cause of action as to certain lands described in Exhibit A, amounting to 27,040.40 acres, leaving the action to proceed against 2,873.84 acres described in that exhibit. An examination of the record discloses the fact, however, that with the exception of two tracts, of 160 acres each, these remaining lands described in Exhibit A are not properly involved in this action; that is to say, a number of the tracts described are clearly outside the limits of the Atlantic & Pacific grant, while other tracts are involved in another suit. The remaining lands involved in this action as being within the granted and indemnity limits of the Atlantic & Pacific Railroad Company, and for which no patents have yet been issued, amount to about 3,000,000 acres.

The answer of the defendants denies plaintiffs' ownership and possession of the lands described in Exhibit A; denies that the Atlantic & Pacific Railroad Company filed maps of definite location, designating part of its line in the state of California, in the general land office in the year 1872, or at any time, or at all; denies that, as said plats or maps were so filed in the interior department, they were each then approved by the secretary of the interior; denies that upon the filing of such maps or plats the United States withdrew from market and reserved all or any of the odd-numbered sections of land in California within 30 miles of the line of route, or that, in pursuance of orders of the secretary of the interior and the commissioner of the general land office, the withdrawal or reservation of said lands was made then of record in the general land office and the United States district land offices in California by proper plats, documents, and maps, or in any manner or at all; denies that any lands in suit herein fell within the 30-mile limits of any such line, or were ever withdrawn from market or reserved for, or for the benefit of, said Atlantic & Pacific Railroad Company. The answer further recites the proceedings relating to the location of the route of the Atlantic & Pacific Railroad Company in California, and alleges that the location or designation of the route was upon an unauthorized and impracticable line, and that the maps filed by the company were fraudulent, spurious, and manufactured, and

deceived the officers of the government. The answer also recites the facts relating to defendants' claim to the lands in question, and the execution of certain mortgages to the other defendants in the action, covering such lands, to secure the payment of certain mortgage bonds.

The decree in the court below was in favor of the plaintiffs, adjudging that the United States are the owners, by title in fee-simple absolute, unincumbered, of all the lands described in the decree, and that all patents issued by the United States to the defendant the Southern Pacific Railroad Company to or for any of said lands are null and void; and by the decree such patents are vacated, and the defendants forever enjoined and restrained from having or claiming any right, title, interest, or lien in or to any of said lands, and the title of the United States to said lands is quieted. The lands described are "all the sections and parts of sections of land in the state of California, surveyed and unsurveyed, designated by odd numbers, within thirty miles on each side of the line of route of the Atlantic & Pacific Railroad Company from the Colorado river to the Pacific ocean at or near San Buenaventura, California, and coterminous with said line of route, as designated and established by the maps filed by said Atlantic & Pacific Railroad Company in the general land office and in the department of the interior in the year 1872, copies of which were introduced in evidence in this cause and are now on file herein, to which maps, designating said line of route, reference is hereby made; excepting, however, from the lands so described, and from the operation of this decree, the following specific tracts of land, which are not embraced by this suit." The lands excepted are those mentioned in the bill as being involved in other suits; the lands described in the order of dismissal entered upon the motion of the United States on January 7, 1898; and also certain lands which it was adjudged were, prior to the commencement of the suit, sold by the defendant the Southern Pacific Railroad Company to third persons, who purchased the same in good faith and for value, and as to such lands the court holding that the act of congress approved March 2, 1896 (29 Stat. 42), confirmed the sale of such lands to the purchasers, whether such patents were issued prior to the institution of the suit or subsequent thereto, for lands for which a contract of sale had been entered into in good faith and for value between the railroad company and the purchaser. U. S. v. Southern Pac. R. Co. (C. C.) 86 Fed. 962. Both parties have appealed from the decree.

Wm. Singer, Jr. (Wm. F. Herrin, of counsel), for Southern Pac. R. Co. and others.

Joseph H. Call, Special U. S. Atty.

Before GILBERT and MORROW, Circuit Judges, and HAWLEY, District Judge.

MORROW, Circuit Judge, after stating the case, delivered the opinion of the court.

The appeal of the Southern Pacific Railroad Company (case No. 494) will first be considered. It will be convenient to designate the parties plaintiffs and defendants, as they were in the court below.

It is contended on the part of the plaintiffs that all the questions involved in the present case with respect to the lands in controversy have been considered in other cases and determined, and, having passed to final judgment, are now res judicata. This was the principal question before the supreme court in Southern Pac. R. Co. v. U. S., 168 U. S. 1, 18 Sup. Ct. 18, 42 L. Ed. 355. It was there contended on behalf of the United States that the lands in dispute in that case were in the same category in every respect with those in controversy in U. S. v. Southern Pac. R. Co., 146 U. S. 570, 13 Sup. Ct. 152, 36 L. Ed. 1091, U. S. v. Colton Marble & Lime Co., 146 U. S. 615, 13 Sup. Ct. 163, 36 L. Ed. 1104, and U. S. v. Southern Pac. R.

Co., Id., and that, so far as the question of title was concerned, the judgment in those cases had conclusively determined, as between the United States and the Southern Pacific Railroad Company and its privies, the essential facts upon which the government rested its claim in the case then before the court. In support of this position it was insisted on the part of the United States that in the former cases the controlling matter in issue was whether certain maps filed by the Atlantic & Pacific Railroad Company in 1872, and which were accepted by the land department as sufficiently designating that company's line of road under the act of congress of July 27, 1866, were valid maps of definite location,—the United States contending in those cases that they were, and the Southern Pacific Company contending that they were not, maps of that character,—and that issue having been determined in favor of the United States, and the lands in dispute in the case then before the court being within the limits of the line of road so designated, it was not open to the Southern Pacific Railroad Company to question the former determination that such maps sufficiently identified the lands granted to the Atlantic & Pacific Railroad Company by the act of 1866, and were therefore valid maps. The defendants, on the other hand, contended in the later case that the decrees in the former cases decided by the supreme court were not conclusive in favor of the United States, either as res judicata or as estoppel or as evidence, for the reason that the case then before the court presented new questions of law, arising upon new and different facts. To determine this controversy it became necessary for the supreme court to ascertain what was in issue and what was determined in the former cases. The court accordingly reviewed the previous litigation between the parties, considered the issues presented by the pleadings, the fact that the lands involved in those suits were within the overlapping limits of the two grants, and determined the scope of the former adjudications. The court then proceeds to consider the questions involved in the case under consideration, and, referring to the lands in controversy, classifies them as follows:

"It may be said that the lands here in dispute belong to one or the other of the following classes: Lands within the common granted limits of both the Atlantic & Pacific grant of 1866 and the Southern Pacific grant of 1871; lands within the granted limits of the Southern Pacific grant and the indemnity limits of the Atlantic & Pacific grant; lands within the Southern Pacific indemnity limits and the Atlantic & Pacific granted limits; lands within the common indemnity limits of both grants. Of those in dispute, 219,012.93 acres have not been surveyed by the United States. But all the lands now in dispute are within the limits of the grant to the Atlantic & Pacific Railroad Company, if the maps filed by that company in 1872, and which were approved by the land department, are to be regarded as maps of definite location." 168 U. S. 47, 18 Sup. Ct. 27, 42 L. Ed. 355.

The lands here classified by the court embrace all the different classes of lands within the overlapping limits of the Atlantic & Pacific grant of July 27, 1866, and the Southern Pacific grant of March 3, 1871, but no special consideration appears to have been given to this fact. The controlling fact appears to have been that all the lands in dispute were within the limits of the grant to the

Atlantic & Pacific Railroad Company, and this fact left but one other question to be determined, and that was the validity of the maps of definite location filed by the Atlantic & Pacific Railroad Company. This question is disposed of by the court in the following comprehensive language:

"It was distinctly adjudged in the former cases, as between the government and the Southern Pacific Railroad Company (146 U. S. 570, 596, 13 Sup. Ct. 152, 36 L. Ed. 1091), that the maps filed in 1872 sufficiently identified the lands granted to the Atlantic & Pacific Railroad Company on the contemplated line between the Colorado river and San Buenaventura, on the Pacific Coast, although, for want of authority in that company to construct a railroad to San Francisco, they did not secure to the company any lands north of San Buenaventura; that is, those maps were directly adjudged to be maps adequately fixing or locating the line of the road under the act of 1866. The records of those cases having been introduced in the present suit, there is no room for doubt—if those records are competent evidence—as to what was in issue and what was adjudged in the former cases. The maps which in this case are relied upon by the United States as maps of definite location, and which the Southern Pacific Railroad Company denies to be of that character, are the identical maps which the government relied on in the former cases, and the same which that company referred to and made part of its answer in the former litigation, and which were adjudged by this court. in conformity with the contention of the government, to be valid maps of definite location. the acceptance of which made it impossible for the Southern Pacific Railroad Company to acquire any interest in any lands granted to the Atlantic & Pacific Railroad Company that were forfeited to the United States by the act of 1886."

The court then proceeds to consider the effect of this adjudication upon the matter in issue under the pleadings in the case before the court, and arrives at the conclusion that it must be taken to have been conclusively adjudicated in the former cases, as between the United States and the Southern Pacific Company:

"(1) That the maps filed by the Atlantic & Pacific Railroad Company in 1872 were sufficient, as maps of definite location, to identify the lands granted to that company by the act of 1866; (2) that, upon the acceptance of those maps by the land department, the rights of that company in the lands so granted attached, by relation, as of the date of the act of 1866; and (3) that in view of the conditions attached to the grant, and of the reservations of power in congress contained in the act of 1866, such lands became, upon the passage of the forfeiture act of 1886, the property of the United States, and by force of that act were restored to the public domain, without the Southern Pacific Railroad Company having acquired any interest therein that affected the power of the United States to forfeit and restore them to the public domain. These grounds being accepted as the basis of our decision, the law in the present case is clearly for the United States; for, as all the lands here in controversy are embraced by the maps of 1872. and therefore appertain to the line located by such maps, it must be, for the reasons stated in the former decision, that the United States is entitled. as between it and the Southern Pacific Railroad Company, to the relief given by the decree below."

In the present case the pleadings disclose substantially the same issues as were in controversy in the former cases, and they are all supported by practically the same evidence; but the defendants seek to distinguish this case from all the previous cases by the fact that a classification of the lands embraced within the limits of the overlapping grant to the Atlantic & Pacific Railroad Company and the grants to the Southern Pacific Railroad Company will show that the

lands in controversy in this case are not of the particular classes involved in any of the former cases. Upon this fact it is claimed that the rights pertaining to such lands have not been determined. This distinction is based largely upon the fact that the greater portion of the lands involved in this case are claimed by the Southern Pacific Railroad Company under what is called its "Main-Line Grant," for that part of its road from Mojave to the Needles, on the Colorado river, while in the former suits the claim of the Southern Pacific Railroad Company to the lands in dispute was under what is called its "Branch-Line Grant," for that part of its road from Mojave, via Los Angeles, to Yuma, on the Colorado river. The classification of the lands of the overlapping grants under which this claim is made may be stated as follows: (1) Lands within the primary limits of the Atlantic & Pacific grant, and also within the primary limits of the Southern Pacific main-line grant; (2) lands within the primary limits of the Atlantic & Pacific grant, and also within the indemnity limits of the Southern Pacific main-line grant; (3) lands within the indemnity limits of the Atlantic & Pacific grant, and also within the primary limits of the Southern Pacific main-line grant; (4) lands within the indemnity limits of the Atlantic & Pacific grant, and also within the indemnity limits of the Southern Pacific main-line grant; (5) lands within the primary limits of the Atlantic & Pacific grant, and also within the primary limits of the Southern Pacific branch-line grant; (6) lands within the primary limits of the Atlantic & Pacific grant, and also within the indemnity limits of the Southern Pacific branch-line grant; (7) lands within the indemnity limits of the Atlantic & Pacific grant, and also within the primary limits of the Southern Pacific branch-line grant; (8) lands within the indemnity limits of the Atlantic & Pacific grant, and also within the indemnity limits of the Southern Pacific branch-line grant. This method of classification might be further extended by considering the Southern Pacific main-line and branch-line grants as overlapping each other within both primary and indemnity limits, and in such relations conflicting with both the primary and indemnity limits of the Atlantic & Pacific grant.

If now we classify the lands involved in the various cases that have been tried and determined, we have the following result: In U. S. v. Colton Marble & Lime Co., 146 U. S. 615, 13 Sup. Ct. 163, 36 L. Ed. 1104 (No. 88 in the circuit court), the land in controversy was within the indemnity limits of the Atlantic & Pacific grant, and the primary limits of the Southern Pacific branch-line grant. In U. S. v. Southern Pac. R. Co., Id. (Nos. 67, 68, and 69, consolidated as No. 68 in the circuit court), the land was within the indemnity limits of the Atlantic & Pacific grant, and the primary limits of the Southern Pacific branch-line grant. In Id., 146 U. S. 570, 13 Sup. Ct. 152, 36 L. Ed. 1091 (No. 178 in the circuit court), the land was within the primary limits of the Atlantic & Pacific grant, and within the primary limits of the Southern Pacific branch-line grant. In Id. (No. 177 in the circuit court), the land was within the primary limits of the Atlantic & Pacific grant, and within the primary limits of the Southern Pacific branch-line grant. In Id., 168 U. S. 1, 18 Sup. Ct.

18, 42 L. Ed. 355 (No. 184 in the circuit court), the lands were within the primary limits of the Atlantic & Pacific grant, and within the primary limits of the Southern Pacific branch-line grant. There were also lands within the primary limits of the Atlantic & Pacific grant and the indemnity limits of the Southern Pacific branch-line grant; and, in addition to these lands, there were lands within the primary limits of the Atlantic & Pacific grant and the indemnity limits of the Southern Pacific main-line grant. It will be observed that the lands involved in these various suits embraced all the four classifications of land in conflict between the Atlantic & Pacific grant and the Southern Pacific branch-line grant, and that in the last case there is a classification of land in conflict between the Atlantic & Pacific grant and the Southern Pacific main-line grant.

The defendants contend that while in the previous cases between these parties lands were in controversy embraced in all the possible classifications of conflict between the grants, except three, nevertheless these three are in the main-line grant of the Southern Pacific, having rights under the statutes which distinguish them from all the other lands heretofore in dispute. The defendants contend further that with respect to the lands in the last case (168 U. S. 1, 18 Sup. Ct. 18, 42 L. Ed. 355), found to be in conflict between the Atlantic & Pacific grant and the Southern Pacific main-line grant, this conflict was not observed when the case was tried in the court below, and was not noticed by the supreme court, and that, with respect to lands lying within the indemnity limits of the Southern Pacific branch-line grant, the right of the Southern Pacific to such lands was not considered or discussed in any of the previous cases.

The controversy with respect to the lands in suit in this case may now be stated as follows: The plaintiffs contend that there is no question to be decided by a classification of the lands in dispute; that all the lands involved were granted to the Atlantic & Pacific Railroad Company by the act of July 27, 1866; that the company failed to build a road west of the Colorado river; that by the forfeiture act of July 6, 1886, congress restored the lands within the limits of the grant to the absolute ownership of the United States, without any right or title having attached to any of the lands under either of the grants to the Southern Pacific Company; that in any event these lands were all excepted and reserved from the Southern Pacific's grants, because withdrawn for the benefit of the Atlantic & Pacific Railroad Company prior to the several dates the Southern Pacific definitely located its railroads; and that the plaintiffs' claim in this respect has been determined in the prior cases mentioned, and is res judicata. The defendants claim that the lands in conflict within the limits of the Southern Pacific main-line grant were granted the Southern Pacific by section 18 of the act of July 27, 1866 (14 Stat. 292), and the joint resolution of June 28, 1870 (16 Stat. 382); that, in any event, the said act and joint resolution of congress granted the Southern Pacific an equal undivided moiety interest in all conflict lands within the limits of its main-line grant; and that defendants' claim in this respect has not been determined, but is open for adjudication. The defendants admit that, on the prin-

ciple of priority of title with priority of granting act, the Atlantic & Pacific grant defeats the Southern Pacific's right and title to all conflict lands within the primary limits of the Southern Pacific's branch-line grant, and that this question has been so determined in prior litigation. But the defendants claim that the Southern Pacific is entitled to select and receive patents for lands lying within the indemnity limits of either its branch-line or main-line grants, and within the limits of the Atlantic & Pacific grant; such lands having been restored to their original status as public lands, and therefore subject to such selection, by the forfeiture act of July 6, 1886.

It is obvious that the first and most important inquiry is as to the right acquired by the Southern Pacific Company, under the act of July 27, 1866, to the lands west of the Colorado river. The grant was in præsenti, and if upon the definite location and construction of the Southern Pacific Railroad in 1885 from Mojave to a point on the Colorado river, where it connected with the Atlantic & Pacific Railroad, the odd-numbered sections of land along that line passed to the Southern Pacific Company, under section 18 of the act of July 27, 1866, as of that date, then the Atlantic & Pacific acquired no interest in that part of the grant, and the act of July 6, 1886, forfeiting the lands granted to that company adjacent to and coterminous with the uncompleted portions of the line of its track, did not affect any lands west of the Colorado river, and gave to the United States no right to assert any claim to such lands under the forfeiture act. This aspect of the case was necessarily involved in any controversy concerning whatever right the Atlantic & Pacific Company may have had in the lands in question. In other words, the claim of the Southern Pacific Company to any lands within the disputed territory of the Atlantic & Pacific grant west of the Colorado river compelled the United States to put in issue the entire title of the latter company to the lands within that territory. In the several cases that have been tried and determined between the parties, the United States have been the plaintiffs, and have had the burden of presenting a clear title in support of the various actions. Hence we find the decisions of the courts upon the issues thus presented dealing with the title of the Atlantic & Pacific Company, and not the title of the Southern Pacific Company. In the case of Southern Pac. R. Co. v. U. S., 168 U. S. 1, 18 Sup. Ct. 18, 42 L. Ed. 355, the supreme court makes this very plain, when, after a review of all the questions involved in previous cases, it holds, as a determination of the controversy, that the maps filed by the Atlantic & Pacific Railroad Company in 1872 were sufficient as maps of definite location to identify the lands granted to that company by the act of July 27, 1866; that upon the acceptance of those maps by the land department the rights of that company in the lands so granted attached by relation as of the date of that act; and that in view of the conditions attached to the grant, and of the reservations of power in congress contained in the act of 1866, such lands became, upon the passage of the act of July 6, 1886, forfeiting the lands granted to the Atlantic & Pacific Railroad Company, the property of the United States, and by force of that act were restored to the public domain, without the Southern Pacific Railroad Company

having acquired any interest therein that affected the ownership of the United States. This declaration of the court as to the character of the title held by the United States as against any claim asserted by the Southern Pacific Company is but a restatement of what was said in U. S. v. Southern Pac. R. Co., 146 U. S. 570, 598, 13 Sup. Ct. 157, 36 L. Ed. 1091. It was there said:

"Congress intends no scramble between companies for the grasping of titles by priority of location, but that it is to be regarded as though title passes as of the date of the act, and to the company having priority of grant, and therefore that, in the eye of the law, it is now as though there never was a period of time during which any title to these lands was in the Southern Pacific."

It is no answer, therefore, to the claim of title presented by the United States in this case under the Atlantic & Pacific grant and its forfeiture by congress, for the Southern Pacific Company to say that previous adjudications cannot be considered, because it has a better title to the lands involved in this case than it had before in the other cases. The primary question is not what claim of title the Southern Pacific Company has to these lands, but what title the Atlantic & Pacific Company had, to which the United States have succeeded, and upon which they now rest their claim of right. The plaintiffs present this title and the evidence in its support, and say upon this evidence in previous litigation between these parties this title has been declared to be valid, and under it the United States hold all the lands in dispute by title in fee-simple absolute and unincumbered. Is not that sufficient, and the adjudication conclusive upon the questions at issue in the present case? In Southern Pac. R. Co. v. U. S., 168 U. S. 1, 18 Sup. Ct. 18, 42 L. Ed. 355, the court said:

"The maps which in this case are relied upon by the United States as maps of definite location, and which the Southern Pacific Railroad Company denies to be of that character, are the identical maps which the government relied on in the former cases, and the same which that company referred to and made part of its answer in the former litigation, and which were adjudged by this court, in conformity with the contention of the government, to be valid maps of definite location, the acceptance of which made it impossible for the Southern Pacific Railroad Company to acquire any interest in any lands granted to the Atlantic & Pacific Railroad Company that were forfeited to the United States by the act of 1886."

The effect of this adjudication upon the title of the plaintiffs is thus explained by the court:

"The general principle announced in numerous cases is that a right, question, or fact distinctly put in issue, and directly determined by a court of competent jurisdiction, as a ground of recovery, cannot be disputed in a subsequent suit between the same parties or their privies; and, even if the second suit is for a different cause of action, the right, question, or fact once so determined must, as between the same parties or their privies, be taken as conclusively established, so long as the judgment in the first suit remains unmodified. This general rule is demanded by the very object for which civil courts have been established, which is to secure the peace and repose of society by the settlement of matters capable of judicial determination. Its enforcement is essential to the maintenance of social order; for the aid of judicial tribunals would not be invoked for the vindication of rights of person and property, if, as between parties and their privies, conclusiveness did not attend the judgments of such tribunals in respect of all matters properly put in issue and actually determined by them."

Further on the court applies this rule to the claim of the United States for the lands embraced by the maps of 1872. The court says:

"Even if we were prepared, upon a re-examination of the former cases, or upon the showing made by the present record, to hold that the maps of 1872 were not valid maps of definite location, we could not for that reason, in this proceeding, go behind the former adjudication, and deny to the United States the benefit of the rule making that adjudication, so long as it was unmodified, conclusive, as between the parties to it, of all matters actually determined under the issues in the prior suits."

The scope of these decisions of the supreme court cannot be mistaken. They were intended to dispose of all the questions in issue, and make it perfectly clear that all the lands embraced within the primary and indemnity limits of the Atlantic & Pacific grant between the Colorado river and San Buenaventura had been forfeited to the United States, and restored to the public domain, free from any claim whatever on the part of the Southern Pacific Railroad Company; and these decisions have been placed upon grounds that leave no room for the consideration of a claim of title based upon the theory that the Southern Pacific Company had acquired a right to the lands contemporaneously with the Atlantic & Pacific Company under section 18 of the act of July 27, 1866. The Southern Pacific Railroad Company referred to in that section was at that time authorized by its charter to build a railroad from San Francisco, through the counties of Santa Clara, Monterey, San Luis Obispo, Tulare, Los Angeles, and San Diego, to the town of San Diego, and thence eastward, through the county of San Diego, to the eastern line of the state; but that is a very different line of road from the one down the San Joaquin valley, through the Tehachapi Pass, to Mojave, and thence eastward to the Needles, on the Colorado river, the authority for the building of which, under its charter, was not obtained from the legislature of the state until April 4, 1870, and was not authorized by congress until June 28, 1870; and then the resolution of congress granting the authority expressly provided for the saving and reserving of all the rights of actual settlers, together with the other conditions and resolutions provided for in the third section of the act of July 27, 1866. Among the other conditions and restrictions contained in that section was the provision that the lands granted were those to which the United States had full title, and not reserved, sold, granted, or otherwise appropriated. What effect this resolution had upon the original grant to the Atlantic & Pacific Company is not now open for consideration. The question was before the court in the cases that have been determined, together with all the facts relating to the claim of the Southern Pacific Company to the grant of land between Mojave and the Colorado river, and was part of the case against plaintiffs' title under the grant. It follows that the claim now made, that in any event the two companies take the lands within the conflicting lines in equal, undivided moieties, must be considered as having been adjudicated and determined adversely to the claim of the Southern Pacific Company.

Nor is there any room for the consideration of a claim of title based upon any supposed rights arising out of a classification of

lands under the different grants to the Southern Pacific Company. It appears, however, that lands claimed as belonging to the mainline grant to that company were in fact involved in the case of Southern Pac. R. Co. v. U. S., 168 U. S. 1, 18 Sup. Ct. 18, 42 L. Ed. 355; and in a petition to the supreme court for a rehearing of the case that fact was pressed upon the attention of the court as distinguishing that case from the former cases, and calling for a different decree. But the court evidently considered that the fact was sufficiently covered by the decision, and refused a rehearing. That question must therefore be considered as having been determined, and is now res judicata. The same disposition must be made of the claim that the right of the Southern Pacific Company to select lands within the indemnity limits is dependent upon the status of the land at the date of selection, and not at the date of the grant, and that, when the forfeiture act restored the lands of the Atlantic & Pacific grant to the public domain, they became subject to selection by the Southern Pacific Company as indemnity for loss of lands within the primary limits. This question was before the court in all the cases that have been determined, and the claim of the Southern Pacific Company to lands within the indemnity limits of the Atlantic & Pacific grant has been considered and denied in all of them; and if, as the supreme court said in U. S. v. Southern Pac. R. Co., 146 U. S. 570, 598, 13 Sup. Ct. 157, 36 L. Ed. 1091, "in the eye of the law, it is now as though there never was a period of time during which any title to these lands was in the Southern Pacific," it is difficult to see how the Southern Pacific Company has sustained any loss of lands within the primary limits of its main-line grant on account of the grant to the Atlantic & Pacific Company, for which it may claim an indemnity out of the indemnity limits of the latter. If the Southern Pacific Company never had any right or title to lands within the grant to the Atlantic & Pacific Company, then it never had any land in that territory to lose. This was one of the conditions and restrictions contained in section 3 of the act of July 27, 1866, and imposed upon the Southern Pacific Company by the joint resolution of congress of June 28, 1870. It was expressly provided by section 3 that if the route of the Atlantic & Pacific grant be found upon the line of any other railroad route, to aid in the construction of which lands had theretofore been granted by the United Stat s, as far as the routes were upon the same general line, the amount of land theretofore granted should be deducted from the amount granted by that act. The main line of the Southern Pacific having been located upon the same general line as that of the Atlantic & Pacific Company between the Needles and Mojave, it follows that the Southern Pacific Company has lost nothing upon that route. The law does not contemplate an indemnity for a loss which has never been sustained, and we think that the supreme court has so determined, and the controversy has been closed. In U. S. v. Colton Marble & Lime Co., 146 U. S. 615, 13 Sup. Ct. 163, 36 L. Ed. 1104, the supreme court had before it the claim of the Southern Pacific Company's branch line for lands within the indemnity limits of the Atlantic & Pacific grant. In disposing of this claim the court held that the

proviso in the act of March 3, 1871 (16 Stat. 573), granting lands in aid of the construction of the Southern Pacific Railroad, that the grant should "in no way affect or impair the rights, present or prospective, of the Atlantic & Pacific Railroad Company," operated to exempt the indemnity lands of the Atlantic & Pacific Company from the grant to the Southern Pacific Company. This is clearly a final adjudication upon the claim of indemnity for the Southern Pacific branch line, as that was the specific claim involved in the case, and leaves no question to be determined in the present case with respect to any claim of the Southern Pacific Company to lands within the indemnity limits of the Atlantic & Pacific grant. The rights of the defendants other than the Southern Pacific Company, as mortgagees to secure the payment of certain mortgage bonds, have also been considered in the previous cases, and determined adversely to their claim.

The appeal of the United States in case No. 495 raises the question as to the correctness of that part of the decree adjudging that certain lands therein described were, prior to the commencement of the suit, sold by the defendant the Southern Pacific Railroad Company to third persons, who purchased the same in good faith for value, and as to which lands it is adjudged that the United States take nothing by the decree. The court below held that by the act of congress of March 2, 1896 (29 Stat. 42), supplementing the act of March 3, 1887 (24 Stat. 556), such of the lands described in the bill as had been patented by the authority of the United States to, and were sold by, the defendant railroad company, for value and in good faith, were thereby confirmed to such persons, whether such patents were issued prior to the commencement of the suit or subsequent thereto. U. S. v. Southern Pac. R. Co. (C. C.) 86 Fed. 962. The act of March 3, 1887, provided for the adjustment of land grants made by congress to aid in the construction of railroads, and for the forfeiture of unearned lands. It required the secretary of the interior to immediately adjust, in accordance with the decisions of the supreme court, each of the railroad land grants made by congress to aid in the construction of railroads theretofore unadjusted, and if it should appear upon the completion of such adjustments, respectively, or sooner, that the lands had been, from any cause, theretofore erroneously certified or patented by the United States to or for the use or benefit of any company claiming by, through, or under grant from the United States to aid in the construction of a railroad, it was made the duty of the secretary of the interior to thereupon demand from such company a relinquishment or reconveyance to the United States of all such lands, whether within granted or indemnity limits; and, if such company should neglect or fail to so reconvey such lands to the United States within 90 days after making the demand, then the attorney general was required to commence and prosecute in the proper courts the necessary proceedings to cancel all patents, certificates, or other evidence of title theretofore issued for such lands, and to restore the title thereof to the United States. The act also provided that as to such of the lands so erroneously cer-

tified or patented which had theretofore been sold by the grantee company to citizens of the United States, or to persons who had declared their intention to become such citizens, the person or persons so purchasing in good faith, and the heirs or assigns of such person or persons, should be entitled to the land so purchased, upon making proof of the fact of such purchase at the proper land office within such time and under such rules as should be prescribed by the secretary of the interior after the respective grants should have been adjusted, and that patents of the United States should issue therefor, and should relate back to the date of the original certificate or patenting, and directing the secretary of the interior, on behalf of the United States, to demand payment from the company which had so disposed of such lands of an amount equal to the government price for similar lands; and, in case of neglect or refusal of such company to make payment as specified in the act within 90 days after the demand, the attorney general was directed to cause suit or suits to be brought against such company for such amount, provided that nothing in the act should prevent any purchaser of lands erroneously withdrawn, certified, or patented, from recovering the purchase money therefor from the grantee company, less the amount paid to the United States by such company as by the act required. The act of March 3, 1891 (26 Stat. 1093), provided that suits by the United States to vacate and annul any patent therefor issued should only be brought within five years from the passage of that act, and suits to vacate and annul patents thereafter issued should only be brought within six years after the date of the issuance of such patents. The act of March 2, 1896 (29 Stat. 42), extended the time for bringing such suits, and provided in section 1 that suits by the United States to vacate and annul any patent to lands therefor erroneously issued under a railroad or wagonroad grant should only be brought within five years from the passage of that act, and suits to vacate and annul patents thereafter issued should only be brought within six years after the date of the issuance of such patents. And it was further provided:

"But no patent to any lands held by a bona fide purchaser shall be vacated or annulled, but the right and title of such purchaser is hereby confirmed."

The question as to who are bona fide purchasers under this act was considered by the supreme court in U. S. v. Winona & St. P. R. Co., 165 U. S. 463, 477, 17 Sup. Ct. 371, 41 L. Ed. 789, and clearly described. The court said:

"Given a bona fide purchaser, his right and title is confirmed, and no suit can be maintained at the instance of the government to disturb it."

The court then proceeded to consider the question whether the holders of title in that case were bona fide purchasers, and said:

"It is earnestly contended by the government that the present holders of the title are not 'bona fide purchasers'; that that term has a fixed and well-defined meaning, as announced in the frequent decisions of this and other courts; that as said in 2 Pom. Eq. Jur. par. 745, 'The essential elements which constitute a bona fide purchaser are, therefore, three: A valuable consideration, the absence of notice, and presence of good faith' (U. S. v. California

& O. Land Co., 148 U. S. 31, 42, 13 Sup. Ct. 458, 37 L. Ed. 354); that while two of these essential elements may be found, to wit, a valuable consideration and the presence of good faith, the third, the absence of notice, is lacking; that all men are conclusively presumed to know the law, and that, as the true rule of construction in reference to these grants was laid down by this court, the purchasers were bound to know such true rule; that the records of the land office disclosed the existence of these homestead entries and pre-emption filings, and therefore they who purchased from the railroad company knew, or at least were chargeable with knowledge of, the fact that those lands could not rightfully have been certified to the railroad company, but were excepted from the terms of grant, and in fact remained the property of the government. It is further insisted that as congress, in this statute, used this well-understood expression, it intended only the protection of such parties as came within the scope of this settled meaning. It is said that the only cases to be covered by this provision were those in which the state or the railroad company, by presentation to the land office before the filing of the map of definite location of a forged relinquishment by the pre-emptor, or one having made a homestead entry, or by some other fraudulent representation, secured a certification or patent to the tracts, and thereafter sold and conveyed to one who purchased in ignorance of the fraud. We are unable to agree with this contention of counsel, for several reasons: In the first place, the situation, as it was known to exist, makes against any such narrow construction. While instances of such fraudulent conduct on the part of the state to which the lands were certified, or the company to which the lands were patented, might exist, yet, in the nature of things, they would be few, and hardly worth the special notice of congress, while, on the other hand, the fact that there had been a difference between the land department and the courts, one construction obtaining in the former prior to the decisions by the latter, and the further fact that by this difference of construction many tracts had been erroneously certified or patented, must have been well known to congress, and naturally, therefore, a subject for its legislation; further, there was no need of any legislation to protect a 'bona fide purchaser.' This had been settled by repeated decisions of this court. U. S. v. Burlington & M. R. R. Co., 98 U. S. 334, 342, 25 L. Ed. 198; Colorado Coal & Iron Co. v. U. S., 123 U. S. 307, 313, 8 Sup. Ct. 131, 31 L. Ed. 182, reaffirmed in U. S. v. California & O. Land Co., 148 U. S. 31, 13 Sup. Ct. 458, 37 L. Ed. 354. For in each of those cases it was decided that although a patent was fraudulently and wrongfully obtained from the government, if the land conveyed was within the jurisdiction of the land department, the title of a bona fide purchaser from the patentee could not be disturbed by the government, so that this provision was absolutely unnecessary if that which is now claimed by counsel for the government is all that was intended by congress. We do not mean to assert that, because legislation to cover such a contingency was unnecessary, therefore the language used by congress necessarily implies something other and different, because, of course, it may have been that congress intended nothing but a simple declaration of the law as it was known to exist. At the same time, the fact that under one construction it was needless raises a presumption that something more was intended, and that congress had in view the protection of other parties than were already protected by general law. But we need not rest on these inferences and presumptions. Other provisions of the acts of 1887 and 1896 make clear the intent of congress. Section 3 of the act of 1887 provides that, if the homestead or pre-emption entry of any bona fide settler has been erroneously canceled on account of any railroad grant, it may be reinstated, provided he has not located another claim or made an entry in lieu of the one so canceled, and also did not voluntarily abandon such entry. By this section congress provided for a reinstating of the title of one deprived thereof by an erroneous ruling of the land department, but at the same time limited the right of reinstating to cases in which the original entryman had not voluntarily abandoned his entry, or had not since that time made a new entry. In other words, it was limiting the restoration of the title of the original entryman to cases in which he had a continuing and present equitable right to recognition. As to all other cases, congress reserved the determination of the equities between the government, the

railroad company, and purchasers from the latter, and in subsequent sections it made provision for the adjustment of such equities. Section 4 of the same act, expressly referring to all other lands erroneously certified or patented to any railroad company, provides that citizens who had purchased such lands in good faith should be entitled to the lands so purchased, and to patents therefor issuing directly from the United States, and that the only remedy of the government should be an action against the railroad company for the government price of similar land. It will be observed that this protection is not granted to simply bona fide purchasers (using that term in the technical sense), but to those who have one of the elements declared to be essential to a bona fide purchaser, to wit, good faith. It matters not what constructive notice may be chargeable to such a purchaser, if in actual ignorance of any defect in the railroad company's title, and in reliance of the action of the government in the apparent transfer of title by certification or patent, he has made an honest purchase of the land. The plain intent of this section is to secure him the lands, and to reinforce his defective title by a direct patent from the United States, and to leave to the government a simple claim for money against the railroad company. It will be observed that the technical term 'bona fide purchaser' is not found in this section, and while it is provided that a mortgage or pledge shall not be considered a sale, so as to entitle the mortgagee or pledgee to the benefit of the act, it does secure to every one, who in good faith has made an absolute purchase from a railroad company, protection to his title, irrespective of any errors or mistakes in the certification or patent. Section 5 of the same act applies to cases in which no certification or patent has issued, and yet the lands sold by the railroad company are the numbered sections prescribed in its grant, and coterminous with the constructed portions of its road; and it is there provided that, where the lands so sold by the company 'are for any reason excepted from the operation of the grant to said company,' the purchaser may obtain title directly from the government by paying to it the ordinary government price of such lands. It is true the term used here is 'bona fide purchaser,' but it is a bona fide purchaser from the company; and the description given of the lands, as not conveyed, and 'for any reason excepted from the operation of the grant,' indicates that the fact of notice of defect of title was not to be considered fatal to the right. Congress attempted to protect an honest transaction between a purchaser and a railroad company, even in the absence of a certification or patent. These being the provisions of the act of 1887, the act of 1896 confirming the right and title of a bona fide purchaser, and providing that the patent to his lands should not be vacated or annulled, must be held to include one who, if not in the fullest sense a 'bona fide purchaser,' has nevertheless purchased in good faith from the railroad company."

Under this decision there is no question but that the purchasers from the railroad company in this case were bona fide purchasers, and are fully protected by the statute.

We are further of the opinion that the bill of complaint did not call for the cancellation of the patents for the lands described. The bill alleged that the officers of the interior department had erroneously, and without any authority of law, caused to be issued to the defendant Southern Pacific Railroad Company patents of the United States, in due form of law, for the tracts of land described in plaintiffs' Exhibit A, attached to the complaint. The prayer of the bill was that plaintiffs' title to the lands described in Exhibit A should be quieted, and that the pretended patents for said lands be vacated and decreed to be void, etc. The lands excepted from the decree as having been sold by the Southern Pacific Company to bona fide purchasers who purchased the same in good faith, and for value are not described in Exhibit A, and were not, therefore, properly involved in the suit for the cancellation of patents. The decree of the circuit court is affirmed.